ROGERS, Circuit Judge,
dissenting.
In 2005, the National Security Archive requested disclosure of “[t]he fourth and fifth volumes of the Official History of the Bay of Pigs Operation” pursuant to the Freedom of Information Act (“FOIA”), 5 U.S.C. § 552. Because the draft of Volume IV (entitled “The Taylor Committee Investigation of the Bay of Pigs”) was publicly released in response to the FOIA request, the request at issue is for release of a draft of Volume V (entitled “CIA’s Internal Investigation of the Bay of Pigs Operation”) that was prepared with the other four volumes between 1973 and 1984 by a staff historian at the Central Intelligence Agency. Volumes I through IV have been publicly released; release of the fifth volume has been withheld by. the agency pursuant to FOIA Exemptions 1, 3 *466 and 5. The district court upheld its non-release based on Exemption 5. Because the agency’s current declarations fail to meet its burden to show the draft is fully protected from disclosure under Exemption 5, I would remand the case to the district court for further consideration.
Congress enacted FOIA Exemption 5, incorporating the deliberative process privilege, to protect against the harm to an agency’s decisionmaking process that results from the disclosure of material that is both predecisional and deliberative. See McKinley v. Bd. of Governors of Fed. Reserve, 647 F.3d 331, 339 (D.C.Cir.2011); accord Wolfe v. Dep’t of Health & Human Servs., 839 F.2d 768, 774 (D.C.Cir.1988) (en banc). The exemption is designed to protect “materials [that] can reasonably be said to embody an agency’s policy-informed or — informing judgmental process.” Petroleum Info. Corp. v. U.S. Dep’t of Interior, 976 F.2d 1429, 1435 (D.C.Cir. 1992). Consistent with “the [FOIA’s] goal of broad disclosure,” the Supreme Court has “insisted that the exemptions be given a narrow compass.” Milner v. Dep’t of Navy, — U.S.-, 131 S.Ct. 1259, 1265, 179 L.Ed.2d 268 (2011) (citations and internal quotation marks omitted). More particularly, the Supreme Court has instructed that the deliberative process privilege under Exemption 5 “has finite limits,” EPA v. Mink, 410 U.S. 73, 87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973) and “requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other,” id. at 89, 93 S.Ct. 827 (footnote omitted).
This court also has emphasized that the privilege “serves to protect the deliberative process itself, not merely documents containing deliberative material.” Mapother v. Dep’t of Justice, 3 F.3d 1533, 1537 (D.C.Cir.1993). “A document is ‘pre-decisional’ if it precedes, in temporal sequence, the ‘decision’ to which it relates,” and “[a]ccordingly ... a court must be able ‘to pinpoint an agency decision or policy to which the document contributed.’ ” Senate of Puerto Rico v. U.S. Dep’t of Justice, 823 F.2d 574, 585 (D.C.Cir.1987) (quoting Paisley v. CIA 712 F.2d 686, 698 (D.C.Cir.1983)). Although a document need not “contribute to a single, discrete decision,” Access Reports v. Dep’t of Justice, 926 F.2d 1192, 1196 (D.C.Cir.1991), an agency must “identify!] the decisionmak-ing process to which [the document] contributed,” id. at 1197. The court has thus treated certain draft agency histories as protected from disclosure under Exemption 5, reasoning that the “disclosure of editorial judgments” made during the agency’s deliberative process “would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work.” Dudman Commc’ns Corp. v. Dep’t of Air Force, 815 F.2d 1565, 1569 (D.C.Cir.1987); see Russell v. Dep’t of Air Force, 682 F.2d 1045, 1048 (D.C.Cir.1982). In each case, the court shielded draft histories from disclosure because the agency’s deliberative process would be revealed by means of “ ‘a simple comparison between the pages sought and the final, published document,” which “would reveal what material supplied by subordinates senior officials judged appropriate for the history and” what they did not. Mapother, 3 F.3d at 1538 (quoting Russell, 682 F.2d at 1049, and noting that Dudman Commc’ns, 815 F.2d at 1569, reaffirmed Russell’s rationale).
Here, the agency identifies the “final history of the Bay of Pigs Operation” as the relevant agency decision, see Appel-lee’s Br. 10, and defends withholding the draft of Volume V on the ground that release “could be expected to ... discourage open and frank deliberations among the History Staff’ and “lead to public con *467 fusion,” Decl. of David S. Robarge ¶ 9 (Nov. 17, 2011); see Jordan v. U.S. Dep’t of Justice, 591 F.2d 753, 772-73 (D.C.Cir. 1978) (en banc). The Chief Historian states, categorically, that release of “any ... draft history at any stage before its completion” as an official agency publication “could be expected to ... discourage open and frank deliberations.” Robarge Decl. ¶ 9 (emphasis added). The Chief Historian views “[t]he back-and-forth peer review process” as “critical to ensuring that any final history is both objective and accurate.” Id. ¶ 10. According to the Chief Historian, the “histories provide ... intelligence officers, managers and decision-makers with ... shared institutional memory regarding historical events for use in current decision-making.” Id. ¶ 4.
“[T]he key question in Exemption 5 cases” is “whether the disclosure of materials would expose an agency’s decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency’s ability to perform its functions.” Dudman Commc’ns, 815 F.2d at 1568. All except the draft of Volume V of the History have been publicly released. In response to a related FOIA request, the agency released Volumes I, II, and IV with “minimal redactions” under FOIA Exemptions 1 and 3, in 2011. See Decl. of Martha Lutz, Information Review Officer ¶ 14 (Sept. 26, 2011). Volume III was released in 1998 pursuant to the Kennedy Assassination Records Act. Id. ¶ 16. Significantly as well, the agency released Volume IV in 1987 as a “draft document,” id. ¶ 17, “before its completion” as an official agency document, Robarge Decl. ¶ 9, in response to the staff historian’s own FOIA request and re-released the draft with fewer redactions in response to the current FOIA request, see Lutz Decl. ¶ 17.
Of course, an agency does not “ ‘waive[ ]’ its right to claim an exemption from disclosure simply because it has released information similar to that requested.” Army Times Publ’g Co. v. Dep’t of Air Force, 998 F.2d 1067, 1068 (D.C.Cir.1993). But at this point the agency’s FOIA-related release of the draft of Volume IV appears from the record to be “fundamentally inconsistent with [the agency’s categorical] claim that release of [the draft of Volume V] would threaten the decisionmaking process of the agency.” Id. at 1070. Even assuming the draft of Volume V is predeci-sional, there is neither a final version of Volume V nor anything in the record to suggest that comparing the draft with the other four volumes would implicate the rationale of Dudman Communications and Russell. The draft of Volume V, moreover, was rejected at the first stage of the agency’s review process, see Lutz Decl. ¶ 20, and was not part of the agency “give- and-take of the deliberative process by which the decision itself is made,” Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C.Cir. 1975).
Yet today the majority reads Dudman Communications and Russell as calling for a per se rule of Exemption 5 protection for draft agency histories. See Op. at 463. The court states that “a draft of an agency’s official history is pre-decisional and deliberative, and thus protected under the deliberative process privilege,” id. (citing Dudman Commc’ns, 815 F.2d at 1568-69, and Russell, 682 F.2d at 1048), and that although a draft history may “die[ ] on the vine.... the draft is still a draft and thus still pre-decisional and deliberative,” id. Designation of a document as a draft, however, “does not end the inquiry,” Arthur Andersen & Co. v. IRS, 679 F.2d 254, 257 (D.C.Cir.1982) (citing Coastal States Gas Corp. v. Dep’t of Energy, 617 F.2d 854, 866 (D.C.Cir.1980)), much less demonstrate that an agency has met its burden to justi *468 fy its withholding under Exemption 5 by identifying the role of the individual document in the deliberative process, see, e.g., Access Reports, 926 F.2d at 1196; Coastal States, 617 F.2d at 868. It is one thing to conclude that disclosure of a draft could “stifle ... creative thinking and candid exchange of ideas,” Dudman Communications, 815 F.2d at 1569, where it is possible to identify editorial judgments by comparing the draft and the final version, and quite another to conclude stifling could occur where there is no final version and the agency has identified the requested document as reflecting no more than the individual staff historian’s view. Troubling as well is the fact that the agency has criticized the staff historian’s work on the draft of Volume V in a declaration filed in the public record of the instant case— stating that in 1981 and 1984 the Chief Historian thought the draft “had serious deficiencies as a historical study” and “offers a polemic of recriminations against CIA officers who later criticized the operation, and against those U.S. officials who [the staff historian] contends were responsible for its failure,” Deck of J. Kenneth McDonald, CIA Chief Historian ¶¶ 6, 13 (Nov. 4, 1987) — while denying any opportunity for the work to speak for itself (even in redacted form); these circumstances, no less than disclosure, could cause current and future staff historians to curtail the candor and creative flair that the agency values as part of its History process.
Neither the majority opinion nor the agency’s current declarations explain why this particular draft document is deliberative, ie., why release of the draft of Volume V “would expose an agency’s deci-sionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency’s ability to perform its functions.” Dudman Commc’ns, 815 F.2d at 1568. The agency claims that the draft of Volume V is “reflective of the iterative review process of the CIA’s History Staff’ and “reflects the give and take of the consultative process.” Robarge Deck ¶ 16. But the agency also avers that the draft of Volume V “never proceeded beyond the first stage of the CIA review process,” Lutz Deck ¶ 20, “was never circulated within the [a]gency,” Robarge Deck ¶ 15, “does not incorporate information and perspectives that would arise from the internal review process,” id. ¶ 14 (emphasis added), and “represents the view of merely one staff historian,” id. ¶ 12. From the current record we know the Chief Historian in 1987 addressed potential harm from release of the draft of Volume V. See McDonald Deck ¶¶ 13-14. But the agency’s subsequent declarations do not incorporate that analysis, adopting instead only the description of the History development process, see Lutz Deck ¶ 22, and the explanation of why the draft of Volume V was rejected, see Robarge Deck ¶ 13. Notably, the 1987 declaration assumed that the draft of Volume V “will eventually go through the full revision, editing and review process” and “later drafts or the final form of this history may be compared to [the staff historian]’s version to determine what changes in evidence, argument and interpretation were made in completing this work.” McDonald Deck ¶ 14. In 2011, however, the Chief Historian advised that “[although Dr. McDonald hoped that Volume V could be edited to a final version, these efforts were unsuccessful.” Robarge Deck ¶ 15. And, of course, the 1987 declaration preceded the agency’s subsequent decisions to release other volumes of the “unfinished” History, Robarge Deck ¶ 12, including a draft of Volume IV. As noted, the 1987 explanation for withholding the draft of Volume V appears to apply equally to the draft of Volume IV, *469 which the agency has twice publicly released, and no agency declaration has explained why the two drafts should be treated differently for purposes of Exemption 5. The rationale of Dudman Communications and Russell also affords no dis-positive answer in the absence of a final version of Volume V with which to compare the draft now sought. Given the post-1987 public releases of the other volumes of the “unfinished” History, and because “disclosure, not secrecy, is the dominant objective of the Act,” Dep’t of Air Force v. Rose, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the agency’s present reliance on a categorical approach for withholding the draft of Volume V under Exemption 5 does not satisfy the agency’s burden under the FOIA.
To the extent the majority’s opinion suggests that agency draft histories are also excused from the statutory requirement that any “reasonably segregable,” non-exempt material be released to the requester, see 5 U.S.C. § 552(b), Dudman Communications indicated otherwise. There the court rejected the argument that withholding release of agency histories under Exemption 5 “will allow agencies to hide all manner of factual information from public view,” stating:
Our holding ... can have no such effect. If a person requests particular factual material — e.g., material relating to an investigation of a war crime — -an agency cannot withhold the material merely by stating that it is in a draft document. In such a case, the agency will usually be able to excise the material from the draft document and disguise the material’s source, and thus the agency will usually be able to release the material without disclosing any deliberative process. When the agency can take such steps, it may not withhold the information under Exemption 5.
Dudman Commc’ns, 815 F.2d at 1569; see Vaughn, 523 F.2d at 1143-44; Arthur Andersen, 679 F.2d at 257-58. The court has “shelter[ed] factual summaries that were written to assist the making of a discretionary decision,” Mapother, 3 F.3d at 1539 (citing Montrose Chem. Corp. of Cal. v. Train, 491 F.2d 63 (D.C.Cir.1974)), and it is conceivable that a draft history could include factual summaries that reflect deliberative judgments. Notwithstanding his criticisms of the staff historian’s work on a “preliminary draft” of Volume V, the Chief Historian stated in 1987 that the “research material and drafts will doubtless be of value” to a staff historian assigned to complete the History. McDonald Decl. ¶ 6. This is not a sufficient response here.
Exemption 5 reaches factual material only if it is “assembled through an exercise of judgment” and does not extend, for example, to a mere “inventory, presented in chronological order,” Mapother, 3 F.3d at 1539. Before granting summary judgment the district court did not review the draft of Volume V in camera — review that the Supreme Court has observed is “often ... required ... in order to determine which [documents] should be turned over or withheld,” Mink, 410 U.S. at 88, 93 S.Ct. 827- — and the agency has provided this court no basis to conclude that all factual material in the draft history reflects deliberative judgments. The declaration of the agency’s Information Review Officer sheds no light on segregability, stating only that the draft of Volume V “contains no reasonably segregable information since the entire document is a draft.” Lutz Decl. ¶25. Such a “vague and conelusory” statement is “inadequate” to support summary judgment. PHE, Inc. v. Dep’t of Justice, 983 F.2d 248, 252-53 (D.C.Cir.1993). “[A] blanket claim of privilege under Exemption 5,” Army Times Publ’g, 998 F.2d at 1071, appears, at this point, to be unwarranted in light of the *470 release of a draft of Volume IV and the agency’s acknowledgments about the draft of Volume V, namely that it contains only “a small amount of classified information,” Lutz Decl. ¶ 14, and that it addresses a 1961 investigation by the agency’s Inspector General whose report the agency released in 1997.[1]
Neither Dudman Communications nor Russell cited the segregability provision in 5 U.S.C. § 552(b). Since those cases were decided this court has held that, regardless of whether a request for segregability is made, “ ‘a district court clearly errs when it approves the government’s withholding of information under the FOIA without making an express finding on segregability,’ ” Morley v. CIA 508 F.3d 1108, 1123 (D.C.Cir.2007) (quoting PHE, Inc., 983 F.2d at 252), and that “failure to fulfill this responsibility requires a remand,” id. The district court stated that “the entirety of Volume V is covered by Exemption 5,” Nat’l Sec. Archive v. CIA 859 F.Supp.2d 65, 68 n. 2 (D.D.C.2012), but this statement was made in the context of explaining why it was unnecessary to address the agency’s invocation of FOIA Exemptions 1 and 3, not whether any portions of the draft of Volume V were reasonably segregable and non-exempt.
Accordingly, I would reverse the grant of summary judgment and remand the case to the district court for further consideration. See Citizens for Responsibility 6 Ethics in Wash. v. U.S. Dep’t of Justice, 746 F.3d 1082, 1095-96 (D.C.Cir.2014). The agency may be able to demonstrate its withholding of the entirety of the draft of Volume V is justified under Exemption 5, but its current declarations do not meet its “burden of proving,” the categorical applicability of the deliberative process privilege, Ancient Coin Collectors Guild v. U.S. Dep’t of State, 641 F.3d 504, 509 (D.C.Cir. 2011); see U.S. Dep’t of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). Likewise, it is possible that segregating and releasing non-exempt portions of the draft of Volume V may be unwarranted, but the district court has yet to make that requisite “express finding.” On remand, the district court’s reevaluation of Exemption 5 should include consideration of the effect of the passage of time; the agency is “not arguing, and has never argued, that a court should never consider the passage of time in determining whether a document is protected by Exemption 5,” Appellee’s Br. 19, and it has identified the draft of Volume V as “representing] the view of merely one staff historian,” Robarge Decl. ¶ 12, expressed thirty years ago about events that occurred over fifty years ago. Thereafter, as necessary, the district court should address the applicability of Exemptions 1 and 3 also invoked by the agency. I respectfully dissent.

. See Appellant’s Br. 13 n. 5 (citing Inspector General's Survey of the Cuban Operation and Associated Documents (1961) (indicating release through CIA Historical Review Program in 1997), available at http://www.gwu.edu/ ensarchiv/NSAEBB/NSAEBB341/IGrptl .pdf)