EUGENE BURGER MANAGEMENT
CORPORATION, Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVEL-
OPMENT, et al., Defendants.

No. CIV.A.98–2812(HHKJMF).

United States District Court,
District of Columbia.

July 12, 1999.

Richard Michael Price, Nixon Peabody, L.L.P., Washington, DC, Daniel Beck, Beck Law Offices, Santa Rosa, CA, for plaintiff.

Fred E. Haynes, U.S. Attorney's Office, Washington, DC, for defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

Ready for resolution are three motions: (1) plaintiff's *Motion to Compel Discovery* ("Plains. First Mot."), (2) plaintiff's *Second Motion to Compel Discovery* ("Plains. Second Mot."), and (3) defendants' *Motion for a Protective Order Staying Discovery* ("Defs.Mot.").

### I. BACKGROUND OF THE CONTROVERSY

Plaintiff, Eugene Burger Management Corporation ("Burger"), provides management services for multi-family apartment complexes financed and regulated under the National Housing Act, 12 U.S.C. § 1701 *et seq.* and the U.S. Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, as implemented by the United States Department of Housing and Urban Development ("HUD"). Burger currently manages sixty-five such HUD projects.

In 1970, HUD began building numerous housing projects. In order to attract private investors, Congress passed legislation allowing HUD to approve and guarantee low rent levels. This provided communities with low cost housing alternatives and allowed investors to make a modest profit. Investors, in turn, contracted with management companies for the daily operations of the housing projects.

In order to insure that participants in the housing programs will honor their financial obligations, HUD uses a screening process known as Previous Participation Review System ("PPRS") or "2530 Process." The purpose of PPRS is to examine a management company's history with HUD properties. A "Participation Control Officer" may then (1) approve the form, (2) disapprove the form, or (3) refer the application to the Review Committee for further action.

In 1998, a "flag" was placed in Burger's PPRS file in order to alert the review process that Burger was potentially guilty of illegal kickbacks. HUD's Multifamily Participation Review Committee acted on the flag and stayed action on Burger's application to manage certain California projects. While that stay was pending, plaintiff brought this suit which seeks a preliminary injunction requiring HUD to permit it to manage those projects while HUD conducts whatever investigation it sees fit into Burger's alleged payment of kickbacks.

That stay has now ripened into HUD's final decision which denied Burger's application to manage those projects. Burger has not yet moved to amend its complaint to seek permanent relief against HUD's action.

### II. THE DISCOVERY CONTROVERSY

Dane Narode, Acting Deputy Chief Counsel of the Administrative Proceedings Division of HUD, had filed a declaration in support of HUD's opposition to Burger's motion for a preliminary injunction. He explained how he came to place the flag in the Burger

**4**

file and denied that he had done so for any retaliatory or improper reason.

While the United States Attorney's office in this jurisdiction can always be counted on to resist any discovery in a case involving judicial review of agency action, it consented to Narode's deposition. During the deposition, however, the Assistant United States Attorney objected to certain questions because he asserted they invaded either the deliberative process, attorney-client, or attorney work product privileges.[1] On occasion,[2] he instructed Narode not to answer these questions and Narode followed those instructions.

When the lawsuit was filed, the administrative record had not been collected and had not been filed. It has now been filed and HUD has expurgated some of the documents in it (in whole or in part) because they fall within these privileges.

Finally, after having filed the administrative record, the United States Attorney's office, as HUD's counsel, has reverted to form. It now resists any further discovery whatsoever and asks me to prohibit it.

In this opinion I will first deal with the claims of privilege as to the documents and then turn to the resumption of Narode's deposition and whether all discovery sought by Burger must now come to an end.

### III. DISCUSSION

#### A. Judicial Review of Agency Decisions

■ Review of agency decisions is not *de novo*, based on a record created for the first time in the district court, but must be based on the administrative record created before the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221, 1226 (D.C.Cir.1993). As just explained, HUD has produced that record but has withheld as privileged certain materials from it.

#### B. Plaintiff's First and Second Motions to Compel

After a motions hearing held on May 14, 1999, I ordered defendants to submit for an *in camera* review those documents which had been completely or partially redacted from the administrative record.

According to defendants' privilege log, ten documents or portions therein were withheld based either on a combination of the deliberative process privilege and the attorney-client privileges or solely on the deliberative process privilege.

#### 1. Deliberative Process Privilege

The deliberative process privilege, also known as the "executive" or "governmental" privilege, serves many purposes:

> [T]o assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980). "Thus, the privilege protects documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, as well as other subjective documents that reflect the personal opinions of the writer prior to the agency's adoption of the policy." *Taxation with Representation Fund v. Internal Revenue Service*, 646 F.2d 666, 677 (D.C.Cir.1981).

■ Although the deliberative process privilege is generally thought of as protecting

---

1. He also asserted what he called an "investigative privilege."

2. In certain instances, the parties made a formal record of the witness not answering the question upon advice of counsel. Occasionally, no formal

record was made but the question was simply left unanswered after an objection was made. In the interests of the comprehensive conclusion of all outstanding discovery issues I have dealt with both situations.

opinion-based information, "the ultimate question in deciding whether the deliberative process privilege applies is not whether the material is 'factual' or not. Courts have found the privilege applicable to information which is heavily factual." *Chemical Weapons Working Group v. United States Environmental Protection Agency*, 185 F.R.D. 1, at 2–3 (D.D.C.1999). "Instead, the critical question is whether 'disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Id.* at 3 (citing *Dudman Communications v. Department of the Air Force*, 815 F.2d 1565, 1568 (D.C.Cir.1987)).

In order for a party to properly claim the deliberative process privilege, it must show that the document is both pre-decisional and deliberative. *Animal Legal Defense Fund v. Department of the Air Force*, 44 F.Supp.2d 295 at 298–99 (D.D.C.1999). Whatever its genesis, the document may lose its status because it memorializes or evidences the policy the agency ultimately adopts on an issue or because the agency used the document in its dealings with the public. *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980).

### 2. *Attorney–Client Privilege*

The attorney-client privilege protects confidential communications made by the client to the attorney for the purpose of seeking legal advice. *Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 617 (D.C.Cir. 1997). That the client intended the communication to be confidential is crucial. "The information is to be protected if one can say that the person who communicated the information never intended it to be disclosed and, but for its disclosure now, it would never have been known." *Evans v. Atwood*, 177 F.R.D. 1, 5 (D.D.C.1997).

While the privilege exists to encourage clients to be candid and thereby secure the best legal advice, it also protects the communications made by the attorney to the client, but only insofar as the attorney's communications disclose confidential communications from the client. *Brinton v. Department of State*, 636 F.2d 600, 603–604 (D.C.Cir.1980). *See Schlefer v. United States*, 702 F.2d 233, 244 (D.C.Cir.1983); *Coastal States Gas Corporation v. Department of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980); *Mead Data Central v. United States Department of the Air Force*, 566 F.2d 242, 253 (D.C.Cir.1977).

The Court of Appeals has also indicated that the attorney-client privilege exists in a governmental context, *i.e.*, in the relationship between the lawyers who work in an agency and the agency officials who call upon them for legal advice. *Tax Analysts v. Internal Revenue Service, supra*, 117 F.3d at 617. But, the information communicated by the agency official must also be confidential, *i.e.*, "communicated with the intention that the attorney not thereafter disclose its contents and for the purpose of securing legal advice or legal services." *Evans v. Atwood, supra*, 177 F.R.D. at 4.

### 3. *Analysis of Documents*

█ With these principles in mind, I will turn to each document which HUD either withheld or expurgated. Before I do, I can speak universally to a particular category of information. Some of the documents are the minutes of the meetings of the Multifamily Participation Review Committee ("the Committee") which reflect how individuals voted or who made and who seconded a particular motion. Disclosure of such information would tend to inhibit the free exercise of the members' obligation to vote their consciences lest their dissenting leads to potential discovery by those aggrieved by agency action as to why they voted as they did. On the other hand, knowing how the members of an agency committee voted does not advance a plaintiff's case one *iota*. Agency action is final agency whether its members voted for it unanimously or 5 to 4. Weighing the absence of any reason to know how the members voted or who made a motion or who seconded it against the inhibition on independent, individual action which disclosure of that information may cause, compels me to conclude that the deliberative process privilege permits HUD to expurgate from the administrative record information as to how the members of the Committee voted and who made or seconded a certain motion.

### a. 1(a)[3]: Meeting Minutes 01/21/99

According to defendant's privilege log, this record contains "Minutes of the Multifamily Participation Review Committee, containing discussion regarding deliberations of the committee which resulted in denial of participation for EBMC. Minutes include factors considered and names of persons making recommendations." The minutes, however, do not contain any deliberative information regarding the discussion held by the Multifamily Participation Review Committee but simply state for the record the action taken by the Committee and the information upon which that action was based. Both are already known by the plaintiff and are not, at this point, privileged.

The remaining portions of the record which defendants seek to withhold as irrelevant should be withheld as they do not concern plaintiff but relate to other companies.

### b. 5: Meeting Minutes 12/18/98

■ According to the privilege log, this record contains "Minutes of the Multifamily Participation Review Committee, containing discussion regarding deliberations for the committee as to how to proceed vis a vis the management applications of EBMC." Defendants claim that portions of this record are protected by the deliberative process privilege. Although the portions dealing with plaintiff are pre-decisional and deliberative and describe the nature of the Committee's discussions, one sentence describes an action which the Committee took publicly. The former is privileged but the latter is not. Thus, I will permit HUD to expurgate only the first two sentences of the first full paragraph on the second page. The second paragraph also reports an action that the Committee took publicly and is not privileged although HUD may expurgate the names of the Committee members who made and then seconded the motion the Committee adopted.

### c. 14: E-Mail Message 12/03/98

■ According to the privilege log, "Message discusses revisions to draft (attached) and requests input on the draft." Defendants claim that this record is protected by the deliberative process privilege. But, the e-mail only transmits the draft of a letter that was sent to Burger's counsel, Richard Price ("Price"), and asks that it be put in final form if acceptable to the recipient. Disclosure of a one sentence transmittal cannot possibly yield any pre-decisional exchanges of views by agency officials.

The draft of the letter might qualify but the final version of it was sent the next day to Price, one day after the date of the e-mail. The final version contained one additional sentence clarifying HUD's position on fee splitting. Revised Administrative Record, Volume I at Document No. 13. The one sentence difference between the draft and the final version is trivial and the disclosure of the draft could not possibly tend to inhibit agency deliberations.

Defendants also claim the record is protected by the attorney-client privilege. But, neither the e-mail nor the letter communicates anything a client intended an attorney to keep confidential. To the contrary, the letter was sent to plaintiff's counsel and was never intended to be confidential.

### d. 15: E-Mail Message 12/03/98

According to the privilege log, "Message discusses proposed revisions by D. Narode to draft letter." The second and third sentences of this e-mail to Frank Malone from Narode do reveal some "give and take" between them as to the purposes of what they were doing. While the two sentences are hardly earth shaking, I believe that they are deliberative and should be expurgated.[4]

Additionally, while it may be of only academic interest, the e-mail does not disclose any "confidential communication" between an attorney and client and is not privileged.

---

**3.** Numerical references in the title in each subsection of this memorandum are to the exhibit numbers which appear in the lower right hand corner of each document.

**4.** The verb "deliberate" is defined as "To weigh, ponder, discuss, regard upon, consider. To examine and consult in order to form an opinion. To weigh in the mind; to consider the reasons for and against; to consider maturely; reflect upon, as to deliberate a question; to weigh the arguments for and against a proposed course of action." Black's Law Dictionary 384 (5th ed.1979).

### e. 17: E–Mail Message 12/02/98

According to the privilege log, "Message forwards draft memo (attached)." The attachment forwarded is the draft of a letter sent to Price, plaintiff's attorney, that I have discussed. As I just explained, the final version as sent contains only one more sentence than the draft. The disclosure of that one sentence could not conceivably harm the deliberative process and the one sentence transmittal of the document from an agency attorney to an agency official is not protected as a confidential communication between a client and an attorney.

### f. 18: E–Mail Message 12/01/98

■ According to the privilege log, "Message contains deliberations of drafter regarding draft letter to EBMC." Without disclosing its contents, I can say that the document reflects tentative and inquisitive positions as to a course of action, and seeks additional information and consultation. Although brief and probably insignificant in the grand scheme of things, it seems to me to fall within the deliberative process as classically defined.

### g. 19: E–Mail Message 10/22/98

■ According to the privilege log, "Message discusses settlement discussion in another case, and settlement discussion with EBMC, and possible response by HUD in settlement discussion with EBMC."

First, the attorney-client privilege claimed does not apply since Narode, the attorney, reports on the actions of others and does not disclose any confidential information given to him by agency officials.

Second, a sentence of the letter does report what was then agency action to be taken in the future in settlement discussions. The sentence anticipates that decision and therefore falls within the deliberative process privilege. The rest of the e-mail merely reports what were then well known facts about the timing of meetings and settlement discussions and expresses the author's intention to pass information along when he gets it. Thus, only the sentence which begins with the word "It" and discloses the anticipated decision must be expurgated.

### h. 24(a): Meeting Minutes 09/29/98

According to the privilege log, this record contains "Minutes of the Multifamily Participation Review Committee, containing references to the focus of deliberations re: EBMC's application and to names of individuals making recommendations to the Committee." While, as I have indicated, the names of Committee members and how they voted need not be disclosed, the other material expurgated only indicates, in a single sentence, the topic of the Committee's discussions. Disclosure of the topic of a meeting would not in itself inhibit the discussion that would take place at the meeting and should be disclosed. The rest of the document deals with another company and is irrelevant.

### i. 30: E–Mail Message 09/02/98

■ According to the privilege log, this record contains a "Message discussing possible action by the Multifamily Participation Review Committee and seeking guidance regarding possible action." First, the message is unprotected by the attorney-client privilege because the client, Phyllis Conrad, does not disclose any confidential information to Narode, the attorney.

■ Second, the e-mail does reflect a tentative decision as to a matter and a request for consultation about it. It is therefore pre-decisional, deliberative, and privileged.

### j. 32: E–Mail Message 08/13/98

According to the privilege log, this record contains a "Request for guidance regarding proposed action by Committee re EBMC." The one paragraph HUD expurgated unquestionably communicates information that Phyllis Conrad, the "client," intended Narode, the attorney, to keep confidential and was communicated to him to secure his legal advice[5].

---

5. Although plaintiff argues that "Dane Narode's declaration waived any objection to discovery of the statements contained therein," (Plains. First Mot. at 16.) this argument is overly broad in that the waiver does not apply to all communications made by Narode's clients to him. While the privilege as to communications relating to the 18 topics in Narode's declaration might well have been waived, the material expurgated has nothing to do with any of them. It deals instead with

## IV. THE NARODE DEPOSITION

### A. *Introduction*

When this lawsuit was brought and the administrative record was being prepared, HUD offered in opposition to Burger's motion for a preliminary injunction the declaration of Dean Narode, the HUD attorney who wrote an e-mail in which he recommended that a "flag" be placed in the Burger file which lead to the postponing of action on its application to manage certain properties. In that declaration he explained that he became aware in the Spring of 1968 that the HUD Inspector General and the United States Attorney's Office for the Northern District of California had "amassed credible information" that Burger had paid kickbacks (his word) to housing project owners. This knowledge led him to recommend the placing of the flag. He denied that he did so in retaliation for Burger's protesting publicly about "HUD's position on kickbacks." Motion to Compel Discovery, Exhibit A at para. 6 and 13. He also denied that HUD had any intention to collect "retroactive fines" from Burger. *Id.* at para. 14.

### B. *The Rozet Lawsuit*

■ The first objection made was to Narode's being asked whether he put the flag in the Burger file "based upon what you perceive to be HUD's position in the Rozet lawsuit as you've defined it." Transcript of Deposition of Dane Narode ("Tr.") at 69. HUD objected on the grounds that Burger was attempting impermissibly to inquire into "a discussion of his [Narode's] internal thought processes." *Id.*

The objection is, in my view, well taken. It specifically demands that an administrative decision-maker explain whether he reasoned in a particular manner in arriving at a conclusion and I fear that forcing the decision-maker to testify to that level of detail will inhibit the independence of his thinking in the future. While such inhibition might in a given case have to be tolerated to acquire crucial information, this question seeks information which seems neither relevant nor likely to lead to relevant evidence. Whether or not Narode thought the position HUD took in this case was similar or dissimilar to the position it took in another case does not advance the inquiry into the legitimacy of the position taken in this case; the sameness or difference of those two positions do not cast any light on the correctness of either or both.

### C. *Whether Narode Acted on His Own*

■ The second objection was to the question whether Narode acted, as counsel put it "on your own or at someone else's direction when you recommended" that the flag be put in the Burger file. Tr. at 79. After some discussion, it became clear that HUD would not permit Narode to explain whether the decision to put the flag in the Burger file was his uniquely as opposed to the product of the direction or recommendation of a superior. *Id.* at 79–82. The objection was that "without absent a clear showing of improper motive, you cannot delve into the internal thought processes and the decision making process." Tr. at 81. Burger rejoined that it was simply trying to find out who made the decision because, if some one else did, Burger had the right to "talk to that person as well." Tr. at 80.

Burger's point is well taken because HUD wants it both ways. If Narode made the decision by himself without guidance from any one else, then the government should be willing to so stipulate so that the record can close on that issue. On the other hand, if some one else directed Narode to file the flag, or recommended he do so, Burger can shape a demand for additional discovery from that person. Knowing whether Narode acted on his own or not will not, in my view, inhibit the give and take between agency officials as they make a decision.

### D. *The Mysterious Fee Splitting Document*

The next objection was to Narode's identifying a certain document. When asked if

---

a then upcoming meeting of the Committee, a topic not discussed by Narode is his declaration. Thus, the authority relied·upon by Burger would itself sustain the attorney-client privilege in this one instance. *Multiform Dessicants, Inc. v. Stan-*

*hope Products Co.,* 930 F.Supp. 45, 47 (W.D.N.Y. 1996) (waiver extends to all communications *pertaining to subject matter of communication* between attorney and client when attorney offered as a witness.)

there was a documents "produced by any specific group or individual" that used the term "fee splitting," Narode indicated that he was "aware of [a] document ... that mentioned the word fee splitting." When asked to identify the document, he indicated that he thought it might be privileged. Tr. at 93. After a discussion that was off the record, the Assistant United States Attorney said that the document had been obtained "by an outside person" and that HUD had obtained it during the course of investigation which did not involve Burger. Tr. at 93.

I cannot rule on this objection on this record. The discussion concerning its contents was off the record and HUD has not provided me with a legal analysis of what the "investigative privilege" is and why it applies here. Accordingly, unless HUD is willing to waive the objection and give Burger the document, it will have to provide me with the document and a detailed explanation of why it is protected by a privilege.

### E. *Frank Malone's Letter*

██ Narode was then shown Frank Malone's letter to Burger's counsel, dated December 4, 1998, in which Malone explained to Price HUD's position, warned him that the Committee would act finally on December 18, 1998, and directed Price to submit any additional information Burger wished to supply to the Committee.[6] Narode was asked whether he supplied any factual information to Malone in relation to the letter. The Assistant United States Attorney insisted that this question "gets into the internal deliberations relating to the development of the letter." Tr. at 103. Burger's counsel protested that he was only asking for factual information. Narode himself then objected that "the factual information you are asking for is privileged under the attorney client privilege." Tr. at 103.

First, assuming the witness himself can claim the privilege, the attorney client privilege has no application here because the communication *from* Narode, the lawyer, did not reveal what was told Narode in confidence by a client.

Second, while the development of a draft of letter would seem to fall within the deliberative process, Malone's letter is an explanation of the agency's decision at that point in the process. It is impossible for Burger to mount a legitimate challenge to the validity of that decision without knowing the facts upon which it was based. While the promotion of candid discussion among agency officials lies at the heart of the deliberative process privilege, a carefully constructed question as to the facts upon which the letter was based presents little ultimate risk that disclosure of those facts would inhibit such discussion. Knowing those facts is the very core of this lawsuit. Narode should therefore answer the question.

### F. *Fine Collection*

██ In his declaration Narode denied that HUD's actions against Burger were designed to collect retroactive fines. After a discussion focusing on the word "retroactive" Narode was asked whether HUD had any thing to do with the Department of Justice's decision to bring a lawsuit for violation of federal laws. When Burger's counsel protested that using HUD's powers to collect money from Burger was the "potential abuse which is the basis for our lawsuit" (Tr. at 125) the Assistant United States Attorney insisted that he needed a "proffer as to the evidence that there's been an abuse before you can start inquiring into the discussions, the work product, the deliberations of the Department of Justice and the HUD personnel who are working with the Department of Justice on this matter." Tr. at 126.

Burger's counsel indicated that HUD did not need such a proffer and the question was left unanswered without further protest.

Assuming in the interest of disposing of this matter promptly that Burger sufficiently protected its right to have me compel Narode's answer, I believe that Narode can be obliged to answer whether HUD had any discussions whatsoever with representatives of the Department of Justice concerning whether there was, could, or should be any

---

**6.** This is the letter to which I referred above, pointing out that the agency draft differed from the final version as sent by a single sentence.

relationship between HUD's activity with reference to Burger and any effort by the Department of Justice to collect fines or any other civil penalties from Burger. The administrative record does reflect meetings between Burger's counsel and Department of Justice representatives looking towards a resolution of the controversy which may have involved the payment of money by Burger in consideration of HUD's dropping the "flag." Burger points to a HUD notice which accompanied the publication of a new version of the *HUD Previous Participation Handbook* which Burger claims renders HUD's using the leverage it had to force Burger to compromise with the Department of Justice improper. *Supplemental Memorandum in Support of Plaintiff's Motion for Preliminary Injunction* at 6 and Exhibit 7 thereto.

Without prejudging the question, there is sufficient evidence to permit at least the inquiry into whether HUD and the Department of Justice coordinated their activities so that a complete record as to the asserted leverage HUD used can be created. On the other hand, HUD's position that Burger must make the record as to such leverage independently of what HUD can be forced to tell it literally requires Burger to do the impossible. There is no other source for such information.

### G. *Meeting with the United States Attorney's Office*

As just noted, there came a point when Burger's lawyer met with Joann Swanson, an Assistant United States Attorney and Narode was asked why he suggested Burger's counsel meet with Ms. Swanson. The Assistant United States Attorney objected that this question invaded Narode's thought processes and Narode did not answer the question at the Assistant's direction. Tr. at 128–129.

HUD's objection was well taken. Asking an official why he did something invades the deliberative process in the most obvious way.

### H. *Settlement Discussions*

■ The next series of questions involved the statement in Narode's declaration in which he said that he told Burger's counsel that he would be amenable to a settlement of the controversy between Burger and HUD

that would include removing the flag if Burger would resolve what Narode called "the issue of payments to owners of projects where EBMC [Burger] was the management agent." Tr. at 129. Finally, Assistant United States Attorney Massullo, who was on the telephone listening to the deposition, objected to any further discussion of potential settlement of the controversy. Her reasoning was that such discussion was protected by the privilege accompanying settlement discussions and that there was the possibility of "disclosing information that Mr. Narode is going [stet] from conversations with either Ms. Swanson or Ms. Massullo, both of which are protected." Tr. at 133.

Additional discussion led to Narode's not being permitted to provide the details of a conversation he had with Ms. Swanson, apparently for the same reason. Tr. at 139.

The privilege for settlement discussions applies, however, only when the discussions are proffered to prove liability. Fed.R.Evid. 408. Burger's purpose in pursuing this line of inquiry was not to establish liability but to explore whether there was an improper connection between HUD's actions in placing and maintaining the flag in the Burger file and the Department of Justice's efforts to settle the case. Moreover, as I have indicated, the asserted improper use of leverage by HUD to induce a monetary settlement with the Department of Justice is, in my view, a legitimate area of inquiry.

### I. *Narode's Recommendation*

■ Narode was asked whether he recommended to the 2530 Committee that it hold off making a decision on Burger's 2530 application for the four projects because a settlement was being negotiated. Tr. at 146. HUD's objection that the question directly invades the deliberative process was well taken. The question unquestionably intruded into the deliberations of that committee as it considered the matter before it and ultimately made its decision.

### J. *The Kickback Policy*

■ Narode was thereafter prevented from stating whether HUD had ever notified management agents of "HUD's kickback pol-

icy." Tr. at 149. The objection was that "under the regulations" he was "not the one to speak to on policy" and "there's also a lawsuit on file for the Northern District of California that articulates the government's position." Tr. at 149. That objection is not well taken. All the question sought was a fact: did Narode know whether HUD had communicated its kickback policy to the agents? An answer to that question would not have disclosed any privileged matter whatsoever. If HUD is concerned about whether Narode is authorized to state what that policy is and wants to rely on the articulation of the policy in pleadings it filed in a court, it can provide those pleadings to Burger's counsel and be ready to stipulate that HUD's policy is contained in that pleading and what that policy is. If it is unwilling to do that, Narode will have to answer that question and any legitimate follow up questions.

### K. Whether The Committee Members Read Documents

Narode was asked whether members of the 2530 actually read certain documents put before them during their deliberations. Tr. at 153. The government's objection that the question invaded the deliberative process privilege is well taken; it was a direct intrusion into the mechanics of how the agency made its decision and would certainly inhibit the exercise of their decision making authority if such inquiry was fair game. In any event, the question also seeks information which is irrelevant. Whether or not the Committee members read or did not read the documents put in front of them does not have any thing to do with the validity of their decision.

### L. Flag Removal

Narode was not permitted to answer whether he was aware if flags placed in management agents' filed had been removed as a result of a monetary settlement. HUD's objection on the grounds of investigative privilege is, as I have indicated, not supported by any legal analysis of that privilege and its application to this situation. More to the point, I persist in my view, that unless HUD is willing to stipulate that flags have been removed as a result of a monetary settlement, factual inquiry into alleged use of leverage by HUD to bring about monetary settlements is a legitimate inquiry.

### M. Opinion Testimony

Narode was prevented from opining whether, if Burger had resolved by agreement the controversy concerning its payments to project owners, HUD would have concluded that Burger was no longer a risk to the integrity of the management of those projects and would have permitted Burger to manage them. Tr. at 140–141.

HUD's refusal to permit Narode to answer was based on a regulation, 24 C.F.R. § 15.82 (1998), which bars its employees from testifying as an expert or opinion witness. No justification is provided for this regulation and it is certainly not authorized by the "housekeeping statute" referred to in *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951). To the contrary, insofar as it purports to prohibit a HUD employee from giving testimony that meets the discovery standard of the Federal Rules of Civil Procedure, it exceeds HUD's authority. *Houston Business Journal, Inc. v. Office of Comptroller of the Currency,* 86 F.3d 1208, 1212 (D.C.Cir.1996). In my view, Narode's view as to whether Burger's settling the case with HUD would have lead to the lifting of flag easily meets the discovery standard of Fed.R.Civ.P. 26(b)(1). Narode should answer the question despite the regulation.

### V. CONTINUATION OF NARODE DEPOSITION

Since I have determined that Narode should have answered certain questions which he was prohibited from answering, it is necessary to permit Burger to ask him those questions and any necessary follow-up questions. Therefore, unless HUD is willing by stipulation to provide the information that Narode did not, I will have the deposition taken before me so that I can personally supervise it. The parties are therefore directed to confer with each other and my chambers to arrive at a mutually convenient date.

## VI. DEFENDANT'S MOTION FOR A PROTECTIVE ORDER STAYING DISCOVERY

 "[D]iscovery in an APA-review case should, as a general rule, only be permitted in two circumstances, where there have been no contemporaneous administrative findings so that without discovery the administrative record is inadequate for review and where there has been a strong showing of bad faith or improper behavior so that without discovery the administrative record cannot be trusted." *Saratoga Development Corp. v. United States*, 21 F.3d 445, 458 (D.C.Cir. 1994).

The inadequacy of the administrative record is a knife that cuts both ways. If the administrative record is record is insufficient its insufficiency may justify the conclusion that the agency's ultimate conclusion is not based on sufficient evidence and justify a court's setting it aside. Since that is so, a plaintiff in an APA action, recalling the Chinese curse—"may you get what you want"—, may not want additional discovery lest it produce essential material which is not in the administrative record. Therefore, a plaintiff's pursuit of additional discovery requires its counsel's sophisticated judgment. While, prior to my decision and to submission of the administrative record, supplemented as I have required, Burger sought "more discovery," but the record before me does not indicate what "more discovery" it wants. All I have is a footnote in one pleading saying that it wished to take the depositions of certain decision makers. I cannot possibly rule on such an abstract request.

Ultimately, events may have overtaken Burger's request for preliminary relief. Narode's "flag" has now ripened into final agency action and the removal of the "flag" seems to be an academic exercise. The parties may now be in the position to seek a final, permanent resolution of their controversy by the filing of cross motions for summary judgment. By doing so, Burger would not be waiving any right it might have since it could respond to HUD's motion for summary judgment by insisting, in accordance with Fed.R.Civ.P. 56(f), that it is entitled to discovery before it may be compelled to respond to HUD's motion for summary judgment. I, therefore, will deny Burger's motion for additional discovery without prejudice and direct the parties to meet and confer with each other and then advise me whether (1) they are willing to agree in accordance with Fed.R.Civ.P. 65(a)(2) that the disposition of the merits of this case be advanced and consolidated with the consideration of Burger's application for temporary relief and if so, (2) agree to a proposed schedule for the filing of cross motions for summary judgment with the understanding that Burger may insist that it is entitled to additional discovery before I rule upon HUD's motion for summary judgment.